Okay, the next case is number 2011-1045, STRECK v. RESEARCH & DIAGNOSTIC CORPORATION. Mr. Zoltyk. Good morning, Your Honors. May it please the Court, I'm going to get in a moment to the legal errors that the District Court made in its decision reversing the Board, but before that I just want to take a brief moment on some background, important background. Now R&D, Dr. Johnson, alleged four actual reductions to practice of the subject matter of count one, and we referred to those in the case as Johnson controls one to four. Right. You can see that five is not an issue. Five is not an issue. The only issue with respect to five is it shows diligence, but it's not an issue in terms of reduction to practice. Okay. Now all of these reductions to practice were prior to STRECK's earliest alleged actual reduction to practice, and STRECK agreed there was no diligence from its conception to its later reduction to practice. Right, but the question is, were there actual reductions to practice? That begs the question. The question is, the sole question in the interference and in the 146 action was whether Johnson controls one to four were actual reductions to practice and whether there was abandonment, especially concealment. That's it. Let's get directly to that point. Okay. Well, importantly, not a shred of the new evidence that came in in the 146 action had to do with Johnson controls one to four, had to do with the specific testing that Dr. Johnson did back in 1996. There was no live testimony relating to one to four? There was live testimony, but it was exactly or it was substantially the same as the testimony regarding Johnson controls one to four that came in in the interference proceeding. But isn't, by definition, one of the things that 146 contemplates is the ability for the trial court to make credibility determinations? Well, I think that gets right to the point with respect to the tension in the court between adjuvant and winner. Well, winners predates adjuvant, right? Absolutely. And so winner has never been overruled. Even by Hyatt, they don't expressly overrule winner. And so how are we supposed to do anything other than follow winner by its own terms? Well, it's the trigger for de novo review that I think is the issue here. And the standard has evolved since Dickinson v. Zirko, and the winner case was one of the first cases in the 146 action that talked about the standard. It was very express in its holding, wasn't it? The winner case? Yes. And I also point out that in the interference proceeding, the cross-examination of the witnesses was videotaped, and that was all submitted to the administrative patent judges at the board. So they had the ability to judge the demeanor and the credibility of those witnesses being cross-examined during their testimony. Okay, but we still would have to say that winner was wrongly decided, correct, in order to reach the conclusion that you want to reach? I think we'd have to say that the standard has evolved where it's critical that there be conflicting evidence. And to say that just because somebody testified essentially to the same thing that they testified to in the interference as a trigger for de novo review really undercuts the agency process. It undercuts the interference. But this is no live testimony. The interference is sold by deposition. So we'd have to keep that straight because this is one of the differences, is it not, in the 146 action? Yes, and the point I was making is that in the interference, there was deposition cross-examination, which was videotaped. So the administrative patent judges had access to that testimony, that cross-examination, just like the district court judge was able to view the witnesses, give their testimony, and their cross-examination in the 146 action. I think that winner is the law of this court. So maybe you want to move on to something else. Okay. Well, I can move on to the issue of reductions of practice in Johnson Controls 1 to 4. And specifically, there were two errors that the district court made. First, misapplying the law, and second, disregarding substantial evidence in favor of legally irrelevant evidence. And specifically, the law with respect to the legal standard for determining when an invention works for its intended purpose. And the law is very clear on this, that this can be established by evidence of testing that proves that the invention will perform satisfactorily in the intended functional setting, correlating to the actual use of the, in this case, the control composition. And the district court stated that law. But the board relied almost entirely on Johnson's own assertion that he knew it would work, right? Well, importantly, the board looked at the actual evidence, the test data from Johnson Controls 1 to 4, which was over a 60-day time period where the control was tested day after day after day. And importantly, the board recognized that Dr. Johnson, with respect to Johnson Controls 1 to 2, the earliest two, was using known control compositions. He was using a complete blood control, which had the white blood cells and the five parts in it that was a commercial product that R&D was selling, and he was combining that with a standalone reticulocyte control, which was, again, a commercial product. But wasn't there testimony that in 1 and 2 it didn't work? The testimony regarding it not working didn't have to do with Johnson Controls 1 to 4. It had to do with testing that was done years later when they were trying to scale it up and commercialize the product. The evidence in the record... It was specifically relating to 1 and 2, was it not? The evidence with respect to 1 and 2, and also 3 and 4, and we look at the contemporaneous evidence at the time, this is a couple of months after Dr. Johnson finished, was that it worked. He said in a report issued in December, which was a couple of months after the Johnson Controls 1 to 4 were tested, and I'm quoting, have shown good reticulocyte recovery with no degradation of other parameters for about 60 days. That's what he said. That's at A18037 and A29135.  And then there's plenty of evidence in the record following that report, which he then gave to his boss, Dr. Detweiler, said the same thing. And then from that report from Dr. Detweiler it went up to the upper management at R&D, and from that point they decided to go forward with it and do a feasibility study. Now the new evidence that came in in the district court case was about business that the judge relied on, was about business decisions that R&D made not to go forward with the commercial product. That's a business decision. But the district court looked at all these different elements that you just stated, and the district court found that it lacked independent collaboration. Right. Can you address that? Absolutely. And in terms of that, there was substantial evidence corroborating the testing of Johnson Controls 1 to 4. Well, you keep talking about substantial evidence. We're talking about the 146 action, treating it as a trial de novo. I think you need to overcome the presumptions in that case. There was sufficient evidence to show by a preponderance that Johnson Controls 1 to 4 were reduced to practice, and there was, to meet the court's standard of independent corroboration, in addition to the test data itself, contemporaneous document, in addition to Dr. Johnson, the inventor's testimony. There was testimony from Dr. Detweiler, who was Dr. Johnson's boss. There was testimony from two scientists, Collins and Lean, who worked in the laboratory with him. That's all chronicled in the addendum to the brief. We had a couple of exhibits that showed all of that evidence. So there was plenty of independent corroborating evidence for Johnson Controls 1 to 4 in that they were. Let me go back to your business evidence. You said that somehow the trial judge wasn't allowed to consider that, but in every case a court can consider both direct and circumstantial evidence. Isn't the fact that they never made a business decision to use the integrated control at least circumstantial evidence that it's because it didn't work? They did go forward with it. It was just a number of years later. Just a number of years later. And the testimony, well, several years later, eight or nine years later, but the testimony was that they were selling the controls, the stand-alone controls, separately at that point. And they made a business decision that they would continue with the stand-alone controls separately. Right, so you argue it's a business decision, but the trial court made the determination that it represented circumstantial evidence that that business decision was made because the controls didn't work. Well, we think that it was legal error for the court to do that in view of this court's decision in Loral and DSL, which talk about commercial considerations that happen after the reduction to practice, not meaning that the earlier work wasn't considered a reduction to practice. Talking about later failures of a test of the invention. But in those cases, all we said was that in those particular cases, it wasn't indicative of that. We didn't say that the court never could, looking at the totality of the circumstances, rely on that as a factor in an appropriate case. Absolutely, the court could consider that evidence, but it doesn't disprove that Johnson Controls I-IV were actual reductions to practice. Right, it wouldn't be the only thing that could disprove it. I agree with you. Well, and in this case, it didn't show it, because for a number of reasons, one of which is that there was no evidence that the later testing that was done was using the same materials as what was used in Johnson Controls I-IV. I mean, back to my earlier point, the new evidence... What's the evidence that shows the actual percentages that were used in Johnson's controls? Well, the actual percentages of the materials are reported in the data that's printed out from the machine for 30 days, 60 days, 90 days, and so on, Johnson Controls I-IV. In terms of what was in there... Right, how do we know if what's being printed out means anything? Because I-IV were commercial products. They were commercial products that R&D was making. You know, Dr. Johnson, as anybody in the company, would have known exactly what was in there, and would have known what to expect when it came out of the machine, and he got what he expected. But there's no evidence. That's all the board found. There's no evidence, is there, in the record, other than his saying, I knew what was going to come out on the back end. You don't have lab results, you don't have notebooks, you don't have anything that says, this is what I put in these controls so that I could know what to measure on the back end. We have testimony that what was used by Dr. Johnson, for example, for Johnson Controls I and II, were the commercial products that R&D was making. We have testimony from Dr. Johnson that those were the commercial products. We have testimony from Mr. Nansen, and then Mr. Lean and Mr. Collins also were in the lab and were familiar with what was in those controls. Do we have a piece of paper that says, here's the sheet that says what our commercial product has in it? We don't, because it was 1996, and we don't have that now. But anybody in the world, of anybody in the world, who would have known exactly what was in those controls, it would have been Dr. Johnson and the scientists in this lab, because they made it, and the company was manufacturing it. He would have known, when those numbers came out, if they were out of range. And I think what's important here is the board, when it reached its decision, said scattergram evidence wasn't necessary because Dr. Johnson got what he expected. And said STRAC hasn't put in any evidence that shows that there was any errors in the data. The board was inviting STRAC to come forward with some evidence that there was errors, that there was interference. There's no evidence that came in, not at the board, and there's no evidence that came in in the 146 action. If there's going to be any new evidence that would contradict what the board found, it would have been evidence that there was interference. And then it's very clear in the record that if there is an error, if there is interference, then you can look at a scattergram. So the board was putting the burden on STRAC when you're the one who's trying to claim the priority? The board found we met our burden, because there were no errors. We had testimony from Dr. Simpson, who was an expert, and we had no challenge to his evaluation of those numbers, that it was stable, which is, by the way, what the count says. And at that point, the board said, we haven't been presented with any evidence that there were errors. I don't understand. The board decision is not evidence in the 146 action. And so we need to concentrate on the evidence before the district court and where that error was. Now, do you want to save your rebuttal time? Yes, I do. I see my time is up. All right, well, then let's hear from the other side. Thank you, Your Honor. Okay. Mr. Nation? Yes, ma'am. May it please the court. The district court properly made findings de novo in this case, and all this court needs to do is review those findings for clear error. The winner case is controlling. There is no doubt the winner case established a clear rule that if there is live testimony on all the issues before the board, there is a de novo trial required. It expressly said clear rule. What about the implications of the Supreme Court taking Hyatt? I don't think that's going to have any effect. It shouldn't have any effect on the 146 case. If it does, Your Honor, well, we don't know whether it will or not. The Hyatt case... I mean, I agree with you that the statutes read differently, but this court has always interpreted them as being parallel proceedings. Well, that's probably true. It will be interpreted as probably parallel. But in Hyatt, the issue really was should there even be any evidence introduced unless there is a showing of... It couldn't have been produced before. But the Supreme Court took both questions. Both whether new evidence should come in and then what standard the review should be. Standard of review. Right. Should there be a standard of review for a district court? It really doesn't apply if there's going to be a trial de novo in the district court. Yes, I think let's stick to this case. On the law as it is now, we have very little time for argument. So proceed. So we think the winner case does apply. It rules. You're looking for errors of fact. Now, the district court made several important findings of fact. Three of them were that scattergram analysis is necessary to determine if a control works for a specific purpose. They also determined there was no proof from Johnson that he actually knew what was in his formulations or that they even worked. And lastly, for this purpose, Johnson did not even appreciate or recognize that his control tests were allegedly successful at the time. Just so I'm clear on this, you did waive any argument with respect to diligence, correct? We made the argument. It wasn't an exact waiver. We made the argument that we did the same thing. That was pretty direct, pretty clear. You said we're not arguing diligence. Wasn't that a waiver? We were not arguing diligence. We did not waive it in the sense that we don't care. What we said was we did the same activity as they did. If they get excused for it, we should. Well, to the extent that the district court purported to make a finding of diligence, there was no evidence or even argument to support that. Is that right? Not. He heard all the facts from the day one. There was evidence as to what we did. He believed that the fact that we didn't have a machine and we couldn't get a machine was an excuse. We did not argue that. We didn't bring it up. He found that on his own, just based on the entire record. But you're not trying to support that conclusion? No, Your Honor. The evidence is crystal clear. They did not reduce this thing to practice. They did not have the evidence. They did not prove it. But we've heard your opponent say that he did prove it, that he had in his mind exactly how the compositions were. And he ran, I guess, inferences, one or two inferences. Let me address that point. It was represented to you. Intersections. I'm sorry. Interferences, one of the inferences. He represented to you that they were commercial products. It was proven at the trial, Your Honor, that one of the, quote, commercial products did not even work on the machine that Johnson used to test it. They knew it didn't work. They had to redesign that control from the start because the CD4000, which was the instrument being tested, was totally different. One of the men that designed it testified it was totally different from a technology standpoint, and he confirmed that the CB3K, which is what they say is a commercial product, didn't work on that product. It never did. The other, quote, commercial product was the 5D. Well, the 5D, it turns out, was not a commercial product. It was a prototype. And not only was it a prototype, it was abandoned later on because it was unworkable. It was unworkable because the scattergram said it's totally out of place. There is interference. Which gets back to your question. Yes? Do you agree that all of the evidence that was presented in the trial court was the exact same evidence that was presented before the board for purposes of priority? Absolutely not. I didn't think so. So why? There seemed to be evidence at the trial court that was not presented to the board. Absolutely. And so why wasn't it presented to the board? Why wasn't it? Putting aside the live testimony piece. Right. The difference is in the procedures. In the trial court, we were able to use documents, R&D documents, that had not been redacted. They had been redacted in the board. They had been selected by R&D as attachments to declarations, written declarations. There is no right to get additional documents. There's no discovery to get additional documents in these interferences. So we have to live with the documents they give us and the form they give us. We found, and we had documents, same documents, in the litigation, unredacted. And I've got an example of one here today if you're interested, but they redacted the information about the 5D from the board evidence, not in the trial court. So there's a big difference there. We also had a big difference in the scope of the examination. We were not able to use any information that we had from the trial in the interference. In fact, they moved for sanctions against me because I asked the board if I could. And they said, no, you're violating the protective order in the trial by simply knowing these documents are there. And it didn't get anywhere. And the judge said, you can use up to a certain date. Let's go back to the scattergram. Yes. Why is it that if each dot in the scattergram represents a number, then why can't the doctor calculate by simple mathematical means a scattergram and have that in its mind and know whether the device is going to work or not? Scattergrams are, well, scattergram is created by these instruments that are being controlled. A scattergram comes in two forms, but one is only really useful. One is the graphic form that you can look at. And it is a, there are several graphs, 20 or 30 graphs for each test. And in these graphs, you will see a spread of dots, each dot representing a cell. There are hundreds and thousands of cells. And the machines have algorithms that can take the characteristics that the machine measures, light scatter, fluorescence, things like that. They have something like 28 different parameters they take. And all that together, it concludes, okay, this is a white cell lymphocyte. This is a reticulocyte. And because of that and the quantities, the numbers, the data that's generated, they know where to put it on the graph. If you were to look at this underlying number. A scattergram would help me understand exactly where all the interferences were. There is a. For a doctor that's trained, a highly skilled doctor, why do they need the visual depiction of what we're talking about? We're talking about a control. Doctors typically don't get involved in running controls. These are for the technicians. These controls are, they have to be run through a machine. The inventor then, let's say, not the doctor. Yeah, I mean, we're not worried about, we're worried about Dr. Johnson, right? That is the only way that you can determine whether there's interference or not. You can't determine interference by looking at stability tests. Stability and interference are two distinct different properties, and both of them, both of them are required for a good control. But if Dr. Johnson knows what's going in and then he looks at the results and he looks at the results repeatedly, can't he essentially do a scattergram in his head to understand whether it's working or not? No, you cannot do a scattergram in your head. They top up the numerical data. Mr. Janik, who testified about the, quote, numerical data for scattergrams, he's talking about computer runs like that. If you wanted to go through all that, he said, I guess you could. But the scattergram is a picture. You can see what's going on. That is required to determine whether there's interference or not. And interference can cause the total control failure if there's interference. Okay, but being required for purposes of the end user using the machine on a regular basis, is that different from being required to know whether or not your controls are working? Absolutely, absolutely. You've got to remember what we're doing. The end user buys a control. He sticks it in his, he runs it through his instrument and see, compare the numbers that he gets from the numbers that are given to him with the control.  He's not testing the control. He's testing his instrument. He's trying to determine whether his instrument is accurate or not. On the other hand, Dr. Ryan and Dr. Johnson were not testing their instrument. They were testing the control. They had to determine by their test whether there was interference and was it stable or not. He did no interference testing whatsoever. How many scattergrams do you need in order to show that you have an acceptable level of interference or not? How many? Yes. It depends, Your Honor, but more than one, I'll say that. Well, we have one. Hundreds, hundreds. Dr. Johnson did at least one, I believe. He kept one scattergram in the file. There's actually two. One, he said, doesn't relate to that. Do you need ten? But no, not with one. You cannot tell. You can tell at that instance it was doing something, whether it was or not. But you have to look at over a period of time. He's doing stability. Is there any interference that causes a change or not? At the beginning, when you first start, you can't just accept the first one. You continue to test to see if there's interference over time. Stability and interference are distinct things. What if the first one showed no interference and you have all of the different blood cells lined up just right? Does he need to have a chapter of scattergrams? It would depend. Dr. Ryan would insist on having a complete set to see. He would repeat these tests over and over. Not Dr. Ryan, Dr. Johnson. Dr. Johnson, he admitted he never analyzed a scattergram, not even the one he had. There is no evidence he ever analyzed a scattergram. That's not disputed. He didn't use it. He said it's not necessary. His technical expert says it's not necessary to determine whether it works for its intended purpose. But on the other hand, their technical expert will say, oh, it's absolutely necessary if you're doing research, early stages of research and development. I asked their expert, Your Honor, I said, early stages of research and development, right? And this was the first time that Dr. Johnson ever did this experiment, ever looked at these controls. And he said, yes. I said, can you get any earlier than that? He said, no. And I said, was that true for all these tests, all four of these we're talking about? He said, yes, necessary. They still, for some reason, they have no connect between for its intended purpose and early development. For some reason, they disconnect the two. The only way they can do it is this end-user argument, which makes no sense for Dr. Johnson or Dr. Ryan to be convinced, to know, and appreciate that they have successfully reduced its practice. That's where we are, Your Honor. As far as the corroborated evidence, there's no corroborational formulation. They say it was a standard commercial product. Turns out one of them wasn't. There is absolutely no piece of paper anywhere that says what he put in. He had no reasonable expectations of what he was going to get out if he didn't know what he put in. The other is, what? You mean, all you have is his testimony that says he knew what he put in. Uncorroborated testimony. OK. He even said he kept a record. But it's sworn under oath. Yes. In fairness, that's a piece of evidence. You're saying it's not corroborated, but. That's not enough. But clearly, that's evidence that the court could rely on. That is evidence. The judge sat there and listened to Dr. Johnson, looked him in the eye, and made a credibility determination. We also, Your Honor, believe that there, as I said, there was new evidence. There were all kinds of new evidence in the forms of oral testimony from 17 witnesses. All of which addressed the underlying facts, the disputed facts that were before the board. So we had oral live testimony. By the way, I don't think that videotapes should overrule the winner case. It says live testimony to the district court. Videotapes sent up to the patent office shouldn't overrule the winner case. That's what he's trying to say. The abandonment issue, Your Honor, they did this test. The one memo you heard, he read, only thing that's favorable about it. And it is ambiguous at best. You also notice it says nothing about interference. Isn't it kind of difficult for us, though, to review a district court determination on something as important as abandonment when it's just dropped into a footnote without citations to the record to support it? It is difficult, Your Honor. And frankly, we don't need it. It is so clear that they did not prove a reduction of practice. They did not prove contemporaneous appreciation at the time. In fact, they stopped using it. He sent a memo out in October when he finished these tests and said, this project looks like it's falling through the crack. We have no plans to do any more testing. No plans. Six years later, they still hadn't done any more testing. Not only that, they didn't even mix up a combination for the fun of it. They just didn't do it. They didn't come out with a commercial product. That is some evidence that the judge could consider as to what they really did or not. They also lost, the record's clear, they lost their biggest client, Abbott, because they did not have an integrated control. Now, that was also evidence. They went to the market with standalone controls, which they developed for that machine, instead of going with this, quote, successful invention that they say Dr. Johnson used. Any more questions? No. Any more questions? OK. Thank you, Mr. Nathan. Would you enlarge, Mr. Zoldyck, the original rebuttal? Thank you. On the corroboration, the district court said R&D's evidence consists mainly of the uncorroborated testimony of the inventor, Dr. Johnson, that he created a composition and it worked. That was at 827. The judge ignored evidence that independently corroborated the development, the work on Johnson Controls 1 to 4, and that those worked, of the other scientists that were working in the lab, and of the contemporaneous documents. But again, the only evidence other than Dr. Johnson's testimony about what the controls were, what the percentages in the controls were, there was no evidence except his testimony. You've just told me it's because it was all commercial product, but your opponent points out that there was testimony in the record that at least as to 5D, that that was not a commercial product. It was a prototype. I'm not even talking about 5D. It doesn't matter. Johnson Controls 1 and 2 are the ones that work. All right. Let's talk about 1 and 2. But it's true that 1 and 2, that CBCK control didn't work, right? And CBC3K control worked just fine when Dr. Johnson ran it and combined it with the reticulocyte control back in 1996. What happened in later testing years later, as to whether it worked or not, is not relevant to what happened in 1996. We don't know all the facts about what happened later on, and that's, I think, what the court was saying in the DSL case and in the LaRouche case. And also, there's testimony in the 146 action, consistent by Streck's own witnesses, that later failures don't mean that the earlier tests didn't succeed. Right, assuming that there was strong evidence that the earlier tests are what you say they are and that they did succeed. Well, there were 20, 30-plus tests that Streck conducted, and lots of them, more than 10, were failures. You know, earlier ones succeeded and the later ones failed. So this idea that just because it didn't work later takes away that the earlier test was successful, it doesn't fly, given the evidence. And it was an error by the court to take that position and consider that evidence to knock out the reduction in practice of Johnson Controls 1. Are you giving up 3 and 4 then? What I'm saying is it doesn't matter. In other words... Okay, so you don't have a response, really, to the fact that 5D was prototyped. They were prototypes, but they were still controls that were made by Dr. Johnson. In other words, he made them in the lab. So he would have known how much of the different materials he put in. Okay, but clearly... I can't produce a piece of paper. The evidence was inconsistent with his original testimony that said that they were commercial compositions, right? Well, all we need is one reduction in practice earlier. You just need 1 and 2. And I'm saying for purposes of, you know, we can focus on 1 and 2. Okay. And the evidence is that 1 and 2 worked. I want to... Well, also I wanted to respond to the issue, to the question you asked about documents being able to come in, the new exhibits that were in the trial that didn't come in in the interference. Well, all right, but be brief, because you've exhausted your time. Yes. Just to say that the judge in the district court infringement case modified the protective order to allow them to put the documents in, and they chose not to. Okay. Thank you, Your Honors. Thank you, Mr. Seltyk and Mr. Dacian. This case is taken under submission, and we'll proceed to...